No. 125,064

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

RANDY ALLEN BALLANTYNE,
*Appellant*.

SYLLABUS BY THE COURT

1.

To convict a defendant of sexual exploitation of a child for possession of child pornography under K.S.A. 2018 Supp. 21-5510(a)(2), the State must prove that a defendant had knowledge of the nature of the visual depiction—meaning, that defendant either knew the essential character or the identity of the visual depiction and that defendant had joint or exclusive control over the visual depiction with knowledge of or intent to have such control or that the defendant knowingly kept the visual depiction in a place where the defendant had some measure of access and right of control. See K.S.A. 2018 Supp. 21-5202(i).

2.

Possession, as that term is used in K.S.A. 2018 Supp. 21-5510(a)(2), includes knowingly accessing and viewing child pornography when a defendant has joint or exclusive control over a visual depiction with knowledge of or intent to have such control or knowingly keeps the visual depiction in a place where the defendant has some measure of access and right of control over it on the internet. See K.S.A. 2018 Supp. 21-5111(v).

1

Appeal from Saline District Court; JARED B. JOHNSON, judge. Submitted without oral argument. Opinion filed February 2, 2024. Affirmed in part and reversed in part.

*Michelle A. Davis*, of Kansas Appellate Defender Office, for appellant.

*Ryan J. Ott*, assistant solicitor general, and *Kris W. Kobach*, attorney general, for appellee.

Before ISHERWOOD, P.J., GREEN and PICKERING, JJ.

GREEN, J.: Randy Allen Ballantyne appeals his 26 convictions for sexual exploitation of a child under K.S.A. 2018 Supp. 21-5510(a)(2). The images forming the basis for his convictions were found on his computer. The State had to rely on circumstantial evidence of knowing possession of the files because the State could not directly establish that Ballantyne had downloaded the files to his computer or that he viewed them at all. On appeal, Ballantyne argues the following: (1) that insufficient evidence existed in support of his convictions; (2) that prosecutorial error in misstating the facts deprived him of his right to a fair trial; (3) that the district court erred in instructing the jury; and (4) that cumulative errors require that he be provided a new trial.

*Images in unallocated space*

Expert testimony established that files in the unallocated space of a computer cannot be accessed or seen without specialized software. No evidence established that Ballantyne knowingly accessed or used any specialized software necessary to retrieve the 25 images in the unallocated space of his computer. Additionally, no evidence established that Ballantyne knowingly accessed and viewed any of the 25 images. Finding insufficient evidence to support Ballantyne's possession of the 25 images found in the unallocated space of his computer, we reverse the 25 convictions.

2

*Video in recycle bin*

Expert testimony established that computer users can access and control files placed by the user into the recycle bin of the computer. We find sufficient evidence to support that Ballantyne was knowingly aware of the presence of the pornographic video found in the recycle bin of his computer and that he knowingly exercised control and influence over the video. We reject Ballantyne's arguments that prosecutorial error or error in the jury instructions deprived him of a fair trial. Thus, we affirm his conviction under count 26 for possession of child pornography found in the recycle bin of his computer.

We affirm in part and reverse in part.

FACTS

The State charged Ballantyne with 25 counts of sexual exploitation of a child under K.S.A. 2018 Supp. 21-5510(a)(2), which prohibits "possessing any visual depiction of a child under 18 years of age shown or heard engaging in sexually explicit conduct with intent to arouse or satisfy the sexual desires or appeal to the prurient interest of the offender or any other person." The State alleged that the crimes occurred on or about March 5, 2019. The State later amended the charging document to add a 26th count of sexual exploitation of a child under K.S.A. 2018 Supp. 21-5510(a)(2), alleging that the crime occurred on or about December 11, 2018.

The case proceeded to a jury trial in December 2021.

The investigation leading to Ballantyne's convictions began in March 2018. It was then that Microsoft Online, through its search engine BingImage, submitted a tip to the National Center for Missing and Exploited Children that child pornography had

3

potentially been accessed. Microsoft monitors its traffic to identify potential users of child pornography material. The National Center referred the CyberTip report to local authorities.

Shea Carpenter, who worked for the Sedgwick County Sheriff's Office and was on the Internet Crimes Against Children task force, received the CyberTip report. Carpenter researched the IP address identified in the report and determined that Cox Communications was the internet service provider for that IP address. Cox Communications identified the subscriber associated with the IP address as Ballantyne's mother in Salina. Carpenter contacted the Salina Police Department with the information.

Detective Aaron Carswell with the Salina Police Department investigated the tip. He began his investigation by visiting Ballantyne's residence along with another officer. Ballantyne answered the door. Detective Carswell told Ballantyne that he had received a tip that child pornography had been downloaded to the Ballantyne IP address.

Ballantyne's computer, an HP laptop, was in his bedroom. Ballantyne said he was the only person in the house to use the laptop. His mother did not use the internet in the home. Ballantyne denied having any inappropriate photos of children on his computer. Ballantyne said he had set up the laptop so that it could not download anything. Detective Carswell thought that sounded strange, and Ballantyne was not able to explain how he was able to set up the computer to not download data. Ballantyne also said there had been attempts to hack his computer and that it might have some viruses.

Detective Carswell procured a warrant to search the residence and removed Ballantyne's laptop from his bedroom. Detective Carswell transferred the computer to Carpenter, who then transferred it to forensic examiner Detective Michael Randolph.

Detective Randolph then analyzed Ballantyne's computer. Through his examination, Detective Randolph recovered 26 items that he believed depicted child sexual exploitation. Twenty-five items were in the unallocated space on the computer. One file was in the recycle bin which is considered allocated space.

Detective Randolph explained at trial the difference between allocated and unallocated space. For example, when a file is created, either by the user or by the computer itself, the file is saved in the allocated space on the computer's hard drive. The place where the file is stored on the drive is allocated to the file. When files are deleted, the space that was previously assigned to the file is treated as unallocated space. The unallocated space still contains the data, or may contain the data, but since it is no longer assigned to a file, it is not considered part of the allocated space. If the computer needs space later, it may overwrite data in the unallocated space. Average computer users cannot access data in the unallocated space—doing so requires specialized software. Detective Randolph did not find evidence of any such software on Ballantyne's computer.

When a user creates a file, for example a Microsoft Word document, the file remains in the allocated space until the user deletes it. The normal deletion process involves placing the file in the Windows recycle bin. Files in the recycle bin remain in allocated space. When the user empties the recycle bin, the file system considers the file deleted. Though the file system considers the file deleted, the data remains on the system in the unallocated space until such a time as that unallocated space is used for new files.

Computers may also create files automatically which are also stored in allocated space. When a person is browsing the internet, for example, the computer will save images that appear on a webpage. The purpose of this function is to speed up the web browsing experience. When a person scrolls through a webpage, it is quicker for the computer to read from the files stored in its own hard drive than to wait to receive those images through the internet. These temporary files are stored in allocated space. After a

period of time, the system deletes these files automatically. For some computers, the temporary cache files are deleted when a person ends a web browsing session and closes the browser. When these files are deleted, they are no longer designated by the computer as existing in the allocated space. But the data remains in the unallocated space until written over.

Images saved automatically by computers are not necessarily seen by the computer user. An example provided at trial was performing a search for fishing lures. If a webpage has 200 pictures of fishing lures, but only a few are visible on the screen, the computer will store files of all 200 pictures on the webpage to a temporary file cache. In this way, Detective Randolph explained, a picture can be downloaded to a person's computer without the person ever seeing the picture because it was not visible on the screen. Though the user controls which websites he or she visits, the user does not control which images from those websites are saved in the browser cache.

The 25 files Detective Randolph found in the unallocated space could not be recalled by Ballantyne without the assistance of specialized software not present on his computer. Detective Randolph could not determine whether Ballantyne or the computer had deleted the files from the allocated space. He also could not say what date the files were deleted, or whether they were even visible on the computer screen. He also could not determine whether the files were saved intentionally, accessed, or viewed.

Detective Randolph had a little more information on the 26th file found in Ballantyne's recycle bin. The file, a video, was created on December 11, 2018, at 1:59 p.m. The file was originally located in the downloads folder. It was moved to the recycle bin that same day at 2:07 p.m. The file was accessed one time before being moved to the recycle bin. Nevertheless, Detective Randolph was unable to determine how long the file was accessed, or whether the user watched the entire video, did not watch it,

6

or took some other action. Because the file was in the recycle bin, it was easily recoverable by Ballantyne.

In addition to searching Ballantyne's files for child pornography, Detective Randolph also examined Ballantyne's web browsing history. He created a timeline of Ballantyne's internet history from October 2018 through February 2019. Ballantyne's browsing history indicated to Detective Randolph that Ballantyne had visited websites associated with child pornography. The display names of the websites included "REAL HARD LITTLE GIRLS PORN!!! ONLY TGP," "9yo Orgazm," "Little Tight Holes," and "PRETEEN KIDS PORN. STRAIGHT AND LESBIAN SEX." Detective Randolph explained that in visiting these webpages, it would have resulted in images being stored in Ballantyne's temporary internet cache where they would ultimately be moved to the unallocated space.

Based on his experience, Detective Randolph believed that Ballantyne intentionally sought out child pornography. He explained that child pornography would not typically appear on legal pornography websites. He also did not find any viruses or malware on Ballantyne's computer that would indicate that someone else put the child pornography files on the computer.

Following Detective Randolph's forensic examination of Ballantyne's computer, police interviewed Ballantyne at the Salina Police Department. Ballantyne claimed that when the police went to his residence, they told him that a woman knew a man who was a computer hacker, and the woman thought the man hacked into Ballantyne's internet and sent child pornography to him. At trial, Detective Carswell said that the officers did not tell Ballantyne anything of that nature. Ballantyne also said that approximately 10 minutes before the police arrived, he got a virus on his computer that caused things to download to his laptop.

During the interview, Ballantyne reported that he had been using the laptop for the past four years and that no one else in the house used his laptop. Ballantyne said that he had seen links to websites with naked children as well as pictures and videos of naked children while he was browsing pornography sites. He initially said that he would scroll past these things but later admitted that he looked at some of the videos and pictures out of curiosity. Ballantyne described the children in the media as "disgustingly young," with the youngest being possibly only four or five years old. He said he had seen "a lot" of videos with children around that age.

Ballantyne maintained that he did not intentionally download anything. He said he would click on images of child pornography, or that they would pop up unsolicited, but he would not download them. Some of these pop-ups occurred while he was browsing adult pornography sites. Toward the end of the interview, Ballantyne said he had been looking at pictures of younger girls for the past couple of years.

Just before the State closed its case, the State moved to amend the charging document. The State wanted to change the date alleged in counts 1-25 from "on or about the 5th day of March, 2019" to "between the 1st day of January, 2014, and the 5th day of March, 2019." The prosecutor explained that the amendment was warranted because Detective Randolph testified that he could not provide a specific date that the files were saved to the computer, and Ballantyne said he had owned the computer for four years. The district court granted the request to amend.

The jury found Ballantyne guilty of all 26 counts. The district court sentenced Ballantyne to 32 months' imprisonment with lifetime postrelease supervision for each of the 26 counts. The court ordered counts 1 and 26 to run consecutive for a controlling sentence of 64 months.

Ballantyne appealed.

ANALYSIS

*Does sufficient evidence support Ballantyne's 26 convictions for sexual exploitation of a child?*

Ballantyne challenges the sufficiency of the evidence supporting his 26 convictions for sexual exploitation of a child under K.S.A. 2018 Supp. 21-5510(a)(2). Specifically, he argues that the State failed to prove that he knowingly possessed the files. For charges 1-25, Ballantyne also argues that the State failed to prove that he possessed the files within the statute of limitations.

Our standard of review is well-established when the appellant challenges the sufficiency of the evidence:

> "'When the sufficiency of the evidence is challenged in a criminal case, we review the evidence in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. An appellate court does not reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses.'" *State v. Aguirre*, 313 Kan. 189, 209, 485 P.3d 576 (2021).

Resolution of the issues in this appeal also requires statutory interpretation. Statutory interpretation presents a question of law over which appellate courts have unlimited review. *State v. Keys*, 315 Kan. 690, 697, 510 P.3d 706 (2022). The most fundamental rule of statutory construction is that the intent of the Legislature governs if that intent can be ascertained. An appellate court must first attempt to ascertain legislative intent through the statutory language enacted, giving common words their ordinary meanings. When a statute is plain and unambiguous, an appellate court should not speculate about the legislative intent behind that clear language, and it should refrain from reading something into the statute that is not readily found in its words. 315 Kan. at 698. Only if the statute's language or text is unclear or ambiguous does the court use

canons of construction or legislative history to construe the Legislature's intent. *State v. Betts*, 316 Kan. 191, 198, 514 P.3d 341 (2022).

The crime of sexual exploitation of a child under K.S.A. 2018 Supp. 21-5510(a)(2) requires proof of "possessing any visual depiction of a child under 18 years of age shown or heard engaging in sexually explicit conduct with intent to arouse or satisfy the sexual desires or appeal to the prurient interest of the offender or any other person." "'Possession' means having joint or exclusive control over an item with knowledge of or intent to have such control or knowingly keeping some item in a place where the person has some measure of access and right of control." K.S.A. 2018 Supp. 21-5111(v). "Control" is not defined by statute, but Black's Law Dictionary defines it as "[t]o exercise power or influence over." Black's Law Dictionary 416 (11th ed. 2019).

*Does Kansas' definition of "possession" encompass the viewing of a webpage?*

The first point to address is Ballantyne's argument that "evidence of internet browsing, in which the computer temporarily saves data in a cache . . . , unknown to the user, who may not view the image, and who takes no action to save or download it, does not constitute knowing possession."

Though Kansas courts have not directly addressed this issue, many courts in other jurisdictions have held that the mere presence of child pornography in a computer's cache or unallocated space, without more, is not sufficient to establish knowing possession. E.g. *United States v. Kain*, 589 F.3d 945, 950 (8th Cir. 2009) ("The presence of child pornography in temporary internet and orphan files on a computer's hard drive is *evidence* of prior possession of that pornography, though of course it is not conclusive evidence of knowing possession and control of the images, just as mere presence in a car from which the police recover contraband does not, without more, establish actual or constructi[ve] possession of the contraband by a passenger."); *Marsh v. People*, 389 P.3d

100, 108 (Colo. 2017) ("To be sure, the presence of photos in the internet cache alone does not automatically establish knowing possession."); *State v. Linson*, 896 N.W.2d 656, 660 (S.D. 2017) ("We agree with those courts holding that the mere presence of child pornography in a computer's cache is not sufficient to establish that a defendant knowingly possessed it; the cached images are not themselves the contraband. Instead, cached images or files are evidence of possession.").

This concept was discussed in *United States v. Kuchinski*, 469 F.3d 853 (9th Cir. 2006). John Kuchinski was convicted of one count each of receipt of child pornography and possession of child pornography in violation of federal law. Police found 16 images of child pornography in Kuchinski's downloaded files folder, 94 images in the recycle bin, 1,106 images in the Active Temporary Internet Files, and another 13,904 to 17,784 images in the Deleted Temporary Internet Files. For purposes of sentencing, Kuchinski's base offense level was 17. The sentencing guidelines provided that the base level of the offense should be increased based on the number of images a defendant received or possessed. If Kuchinski possessed 110 images, then two levels would be added. But if he possessed more than 600 images, then five levels would be added. Kuchinski conceded that he knowingly received and possessed the 110 files found in his downloads folder and recycle bin. But he argued that the government provided insufficient evidence to prove that he received or possessed the internet cache files.

The court held that the presence of the images in Kuchinski's cache was insufficient to prove that Kuchinski knowingly received or possessed them. 469 F.3d at 863. The court noted that computers automatically cache files without input from the user, and the user might not even know it is happening. While a sophisticated computer user may be able to access the cache files, there was no evidence that Kuchinski was sophisticated, that he tried to access the files, or that he even knew they existed. The court concluded:

"Where a defendant lacks knowledge about the cache files, and concomitantly lacks access to and control over those files, it is not proper to charge him with possession and control of the child pornography images located in those files, without some other indication of dominion and control over the images. To do so turns abysmal ignorance into knowledge and a less than valetudinarian grasp into dominion and control." 469 F.3d at 863.

The reasoning of *Kuchinski* and other cases seems sound. If the State had proceeded under the theory that Ballantyne possessed child pornography solely because the images were found in the unallocated space on his computer, then there would not have been sufficient evidence to sustain Ballantyne's convictions. But as the State notes in its brief: "The State's theory was that Ballantyne possessed these 25 images on his computer by viewing and downloading them, while acknowledging that further details about the files were impossible to obtain because the files had been deleted and their details removed from the computer." The State explains that this is why it charged a date range in the complaint spanning over five years—it was not charging Ballantyne for possessing the files in the unallocated space on the day the computer was seized; it was charging Ballantyne for possessing the images by viewing them at some point during that time period.

The parties' arguments raise the legal question of whether viewing child pornography on a website amounts to knowing possession and control of child pornography. This is an issue of first impression in Kansas. If viewing does amount to possession, there is also a factual question of whether the State presented sufficient evidence for the jury to infer that Ballantyne viewed the images at issue. These questions are really the primary dispute in this appeal. Both parties cite caselaw from other jurisdictions in support of their respective positions. We note that while caselaw from other jurisdictions is not binding on this court, it can be considered as persuasive authority.

Some jurisdictions expressly prohibit viewing child pornography. See, e.g., 18 U.S.C. § 2252A(a)(5)(B) (prohibiting knowingly possessing or knowingly accessing with intent to view child pornography); Alaska Stat. § 11.61.127(a) (defining possession of child pornography as knowingly possessing or knowingly accessing on a computer with intent to view proscribed material); N.J. Stat. Ann. § 2C:24-4b(5)(b)(i) (establishing crimes when a person "knowingly possesses, knowingly views, or knowingly has under his control, through any means, including the Internet . . . items depicting the sexual exploitation or abuse of a child"); *Marsh*, 389 P.3d at 112-13 (Gabriel, J., concurring in part and dissenting in part) (listing additional statutes that expressly prohibit viewing child pornography on the internet).

Kansas law does not expressly prohibit the viewing of child pornography. There are other jurisdictions that do not expressly prohibit it either. Nevertheless, that has not stopped courts in those states from finding that viewing can amount to possession. The courts are far from unified on this subject and have arrived at various conclusions when asked to decide whether knowingly accessing and viewing child pornography on the internet constitutes possession of child pornography. The courts have also differed in the value they afford to evidence that a defendant had child pornography in his or her cache or unallocated space. We will examine some of these cases.

Ballantyne cites *United States v. Dobbs*, 629 F.3d 1199 (10th Cir. 2011), in support of his position. There, police found over 150 images of child pornography in the temporary internet cache of Terry Dobbs' computer. The government initially charged Dobbs with possession of child pornography and knowingly receiving or attempting to receive the child pornography in violation of federal law. Before trial, however, the government dismissed the possession charge. Additionally, the district court only permitted the government to submit two of the images to the jury.

13

As in this case, a forensic expert testified that web browsers automatically download images of a webpage to the cache, regardless of whether the images are visible on a computer's monitor. There was no evidence that Dobbs accessed the cache or even knew it existed. There was evidence that Dobbs had conducted multiple searches for child pornography and had visited websites consistent with child pornography. A forensic specialist also discovered "a pattern indicative of the hunt for child pornography." 629 F.3d at 1202. Specifically, the forensic specialist testified that some of the suspect images found on Dobbs' computer were immediately preceded by searches using terms for child pornography. But there was no evidence that Dobbs visited a child pornography website or that he searched for it immediately before the two images forming the basis of his charges entered his cache.

There was no question that Dobbs received the images, but Dobbs argued that he did not receive them knowingly. He asserted that because he did not know that his computer automatically saved files in the cache, he could not have knowingly received the files. On the other hand, the government argued that Dobbs' conviction was supported by the evidence that Dobbs engaged in a pattern of methodically seeking out child pornography and because he had the ability to control the images when they appeared on his screen.

The court, however, found Dobbs' argument persuasive. The court noted that the government presented no evidence that Dobbs accessed the two images at issue while they were stored in his computer's cache. And Dobbs did not know about the computer's automatic-caching function. The court rejected the government's argument that Dobbs' pattern of viewing child pornography supplied sufficient evidence to support his conviction. 629 F.3d at 1204. Although there was a pattern of searches preceding some of the images found in the cache, there was "no evidence of suggestive searches immediately prior to the creation of those two images in the cache, nor [was] there any indication that Mr. Dobbs visited suspect websites prior to their arrival in his cache." 629

14

F.3d at 1204. The court also noted that "[a]s for any child pornography that may have appeared on Mr. Dobbs's computer monitor, the government's argument . . . breaks down when we specifically focus on the two images at issue" because "[t]he government presented no evidence that Mr. Dobbs actually saw the two images on his monitor, such that he would have had the ability to exercise control over them." 629 F.3d at 1207.

Chief Judge Mary Beck Briscoe dissented. She believed the government's evidence was sufficient because it showed that Dobbs methodically sought out child pornography. She noted that the forensic examiner testified that the two images at issue were a result of Dobbs' searches. 629 F.3d at 1212 (Briscoe, C.J., dissenting). Chief Judge Briscoe was not concerned with the fact that the government did not offer direct proof that either of the two images actually appeared on Dobbs' computer monitor. She was not persuaded "that such direct proof, which would be nearly impossible for the government to muster given the obviously secretive nature of the charged crime and the limitations of computer forensic science, was essential or, for that matter, required in order to support a conviction under 18 U.S.C. § 2252(a)(2)." 629 F.3d at 1213 (Briscoe, C.J., dissenting). She "conclude[d] the jury could have reasonably inferred that Dobbs would have, in his search for child pornography images, methodically scrolled down the entire length of each web page he accessed, including the pages that contained the two images at issue." 629 F.3d at 1213 (Briscoe, C.J., dissenting).

Chief Judge Briscoe also dismissed Dobbs' argument that he had to know about the computer's caching process. In her view, it was sufficient that Dobbs intentionally sought out and viewed images of child pornography because this activity "afforded Dobbs temporary dominion and control over the images" which was "sufficient to establish his knowing receipt of the images." 629 F.3d at 1213 (Briscoe, C.J., dissenting). In support of her counter argument, she cited *United States v. Romm*, 455 F.3d 990, 1000 (9th Cir. 2006), which held that the defendant exercised control over cached images of child pornography and knowingly possessed them when they were displayed on his

15

screen because at that moment, the defendant "could print the images, enlarge them, copy them, or email them to others."

The caselaw from other jurisdictions is just as divided as the Tenth Circuit was in *Dobbs*. Though *Dobbs* was a receipt case as opposed to a possession case, it still touches on concepts relevant to resolution of the issues in this case, including whether viewing amounts to possession and what reasonable inferences can be drawn from computer evidence.

Ballantyne also cites *People v. Kent*, 19 N.Y.3d 290, 970 N.E.2d 833 (2012), and *State v. Barger*, 349 Or. 553, 247 P.3d 309 (2011), in support of his position. In *Kent*, James Kent challenged the sufficiency of the evidence underlying his conviction for possessing a sexual performance by a child. The evidence showed that the cache of temporary internet files on Kent's computer contained an image of a child pornography website called "'School Backyard.'" 19 N.Y.3d at 296. There was no evidence that Kent was aware of his computer's cache function or that the file was stored in the cache. The Supreme Court, Appellate Division, New York's intermediary appellate court, affirmed Kent's conviction. 79 A.D.3d 52, 910 N.Y.S.2d 78 (2010). The court supported its decision by noting that the presence of the webpage stored in the cache was evidence that the webpage was accessed and displayed on Kent's computer screen. The court cited overwhelming circumstantial evidence to support its holding that Kent accessed the "'School Backyard'" webpage knowingly, and thus established "dominion and control over the images." 79 A.D.3d at 68.

The New York Court of Appeals—New York's highest appellate court—reversed Kent's conviction for possessing a sexual performance by a child. 19 N.Y.3d at 299. Central to the court's holding was the concept that viewing child pornography did not amount to possession of child pornography. The court believed that even if there was evidence that images of child pornography were previously viewed, "to possess those

16

images . . . the defendant's conduct must exceed mere viewing to encompass more affirmative acts of control such as printing, downloading or saving." 19 N.Y.3d at 301. In support of its holding, the court noted that "[f]ederal courts have held that for digital images to constitute evidence of knowing possession of child pornography, such images must be connected to something tangible (e.g., the hard drive), as they are when stored in a cache, and that the defendant must be aware of that connection." 19 N.Y.3d at 301 (citing *Romm*, 455 F.3d at 1000).

One judge disagreed with the majority's reasoning. She did not think it was necessary for the majority to address whether viewing amounted to possession because the government did not pursue that theory. 19 N.Y.3d at 306-07 n.2 (Graffeo, J., concurring in result only). But because the majority essentially legalized "the purposeful viewing of child pornography on the Internet . . . in New York," she felt compelled to respond to the majority opinion. 19 N.Y.3d at 307. Judge Victoria Graffeo believed that the definition of the word "'control'" as used in the statute prohibiting possession of a sexual performance by a child included knowingly accessing and viewing child pornography on the internet. 19 N.Y.3d at 307-08 (Graffeo, J., concurring). She explained how a person can control something intangible on the internet:

> "When using the Internet, a person must first decide to search for Web sites that contain child pornography and, once they are located, to choose a particular item to observe. Once the desired image appears on the screen, the user must then engage in a variety of decisions that exemplify control over the displayed depiction: continue looking at the image or delete it; decide how long to view it; once the viewing is complete, to keep the image in its own tab or browser window, or simply move on to some other image or Web page; save the image to the hard drive or some other device; or print it in a tangible format. Through this process, the viewer exercises power over the image because he manages and controls what happens to it. [Citation omitted.]" 19 N.Y.3d at 308 (Graffeo, J., concurring).

17

Judge Graffeo also provided a few other examples. A person can authorize a transfer of funds between accounts on a banking website. A person can engage in online shopping by entering order and payment information and approving the transactions. When a person browses a news website, the person "controls the images that appear on the screen by deciding whether to keep reading an article, click a hyperlink, go to another site or exit the browser altogether." 19 N.Y.3d at 308 (Graffeo, J., concurring).

In addition to analyzing the plain meaning of the word "'control'" as it is used in the New York statute, Judge Graffeo also examined the history and purpose of the statute. 19 N.Y.3d at 309-10 (Graffeo, J., concurring). She found that the purpose of the statute was to protect children from exploitation, "and an image does not become any less exploitative because it is viewed on a computer." 19 N.Y.3d at 310 (Graffeo, J., concurring). She believed that the market for child pornography would enlarge "with the knowing viewing of these images . . . because the more frequent the images of children engaged in sexual conduct are accessed, the more the creators produce to satisfy the growing demand, which results in more children being coerced and groomed for the sex trade." 19 N.Y.3d at 311 (Graffeo, J., concurring).

One judge, Judge Smith, wrote to respond to Judge Graffeo's concurrence. He agreed that New York's laws were "designed to target the consumers of child pornography, in the hope of eliminating the market for it." 19 N.Y.3d at 312 (Smith, J., concurring). But he did not think that the court should "read[] the statutes expansively, to include as many 'consumers' as the statutory language can reasonably be interpreted to permit." 19 N.Y.3d at 312 (Smith, J., concurring). He explained that someone who simply clicks on a link for the purpose of looking at a pornographic picture for free has never interacted with a child victim, never copied, downloaded, or saved child pornography, and has not provided money to a person who provides child pornography. Yet such a person would be subject to serving up to seven years in prison for a first offense. Judge Smith thought this "a stringent punishment for someone whom many

18

would think more pathetic than evil." 19 N.Y.3d at 313 (Smith, J., concurring). Judge Smith also warned that the legislature may not have intended "[a] policy of draconian enforcement directed at the most minor and peripheral of users" because such a policy "is perhaps no more likely to eliminate child pornography than a similar policy would be to eliminate illegal drugs." 19 N.Y.3d at 313 (Smith, J., concurring). In sum, Judge Smith believed the questions were for the legislature to decide. And unless the legislature "plainly said so," the court should not find that the legislature "intended to criminalize all use of child pornography to the maximum extent possible." 19 N.Y.3d at 313 (Smith, J., concurring).

Ballantyne cites a similar case from the Oregon Supreme Court. In *Barger*, 349 Or. 553, the court was asked to determine whether a person could "be found guilty of 'possess[ing] or control[ling]' digital images of sexually explicit conduct involving a child . . . based on evidence showing only that the person searched for and found such images through the Internet on his or her computer?" 349 Or. at 555. The evidence showed that police found eight images in the temporary internet file cache on Barry Barger's computer. There was no evidence that Barger knew about the computer's automatic caching function. Barger argued at trial that "even if it was possible to infer that [he] had *accessed* the images through web browsing, that inference was insufficient to establish [his] knowing *possession* or *control* of those images." 349 Or. at 557. The trial court rejected his argument, and he was convicted of eight counts of encouraging child sexual abuse in the second degree for possessing or controlling a visual recording of sexually explicit conduct involving a child.

The Oregon Supreme Court reversed Barger's convictions. 349 Or. at 555. The court examined the legislative intent underlying the enactment of the relevant law, beginning with the meaning of the terms "'possess'" and "'control.'" 349 Or. at 558-59. The court determined that the legislature used both terms to prohibit both physical possession of an item as well as "exercis[ing] dominion or control (*i.e.*, a restraining or

19

directing influence) over it *in some other way*." 349 Or. at 560. Despite recognizing that possession or control extends beyond mere physical possession, the court did not find that viewing child pornography was included within the statute at issue. The court noted that a separate statute prohibited exchanging value to obtain or view child pornography. 349 Or. at 560-61. The court reasoned that possessing or controlling child pornography must be different than obtaining or viewing it because the legislature chose to only punish obtaining or viewing child pornography when value was exchanged. 349 Or. at 561. The court recognized that courts in other jurisdictions had reached opposing conclusions based on nearly identical theories but distinguished its holding by the fact that Oregon had different statutes addressing "possession" and "viewing" of child pornography. 349 Or. at 567 n.13. As with many cases on this subject, there was a dissenting opinion which would have held that viewing child pornography amounted to possession or control of it. 349 Or. at 571 (Kistler, J., dissenting) (citing *State v. Ritchie*, 349 Or. 572, 585-98, 248 P.3d 405 [2011] [Kistler, J., dissenting]).

Like Ballantyne, the State also identifies several cases which support its position that evidence of viewing child pornography is sufficient to establish that a defendant has possession or control of it. In *People v. Josephitis*, 394 Ill. App. 3d 293, 294, 914 N.E.2d 607 (2009), John Josephitis was convicted of possession of child pornography. The evidence showed that Josephitis viewed child pornography on subscription websites. His computer's temporary internet file cache contained files portraying child pornography. Josephitis admitted that he viewed six of the files from the cache.

The Illinois Appellate Court affirmed Josephitis' conviction. 394 Ill. App. 3d at 294. The court noted that possession could be physical or constructive, and because Josephitis did not knowingly save the images in his temporary internet files cache the court examined caselaw on constructive possession. 394 Ill. App. 3d at 299. Looking at caselaw involving narcotics, the court defined constructive possession as having "knowledge of the presence of a substance and that it was his immediate presence and

control" which includes "both the intent and capability to control the substance." 394 Ill. App. 3d at 299. The court noted that Josephitis "had the ability to copy, print, or send the images to others" when they appeared on his screen, and though there was no evidence that he actually took these actions it was not necessary. 394 Ill. App. 3d at 301. This, coupled with evidence that Josephitis "actively sought out illicit Web sites, paid for access, maintained the Web sites among his 'favorites,' and viewed numerous photos of child pornography in the three weeks leading to his arrest" was sufficient for the court to find that the State established possession of child pornography. 394 Ill. App. 3d at 301. The court concluded that "[a]ny other finding would completely frustrate the purpose of the child pornography statute." 394 Ill. App. 3d at 306.

The State also discusses *Commonwealth v. Diodoro*, 601 Pa. 6, 7, 970 A.2d 1100 (2009), another case in which the Pennsylvania Supreme Court analyzed "whether accessing and viewing child pornography over the internet constitutes 'control' of such pornography under [Pennsylvania law]." The evidence showed that there were 370 images related to child pornography on Anthony Diodoro's computer in either the temporary internet cache files or in the unallocated space. A forensic examiner "testified that finding the images of child pornography stored in the cache files indicated that someone accessed the child pornography websites and by clicking the 'next' button or a specific image, accessed and viewed the various images." 601 Pa. at 8. Diodoro stipulated that he viewed the files on his computer while he was searching the internet for images of women under the age of 16. Thirty of the images were unlawful child pornography.

To determine whether Diodoro's actions in seeking out and viewing the images constituted "'control'" necessary to establish that Diodoro knowingly possessed child pornography, the court considered the common meaning of the term. 601 Pa. at 17-18. The court concluded:

21

"An individual manifests such knowing control of child pornography when he purposefully searches it out on the internet and intentionally views it on his computer. As the testimony in this case showed, in such a situation, the viewer has affirmatively clicked on images of child pornography from different websites and the images are therefore purposefully on the computer screen before the viewer. Such conduct is clearly exercising power and/or influence over the separate images of child pornography because the viewer may, *inter alia*, manipulate, download, copy, print, save or e-mail the images. It is of no import whether an individual actually partakes in such conduct or lacks the intent to partake in such activity because intentionally seeking out child pornography and purposefully making it appear on the computer screen—for however long the defendant elects to view the image—itself constitutes knowing control." 601 Pa. at 17-18.

The State also cites *State v. Mercer*, 324 Wis. 2d 506, 782 N.W.2d 125 (2010), which is a little different factually but still lends support to the State's position. Monitoring software on Benjamin Mercer's workstation computer alerted his employer that he may be searching the internet for child pornography websites. A detailed review of the computer logs showed that on 50 different days Mercer searched for and visited websites containing child pornography. The evidence also showed that Mercer had taken steps to delete his computer's temporary internet file cache. There was no evidence that any of the images existed on the hard drive of Mercer's computer. The court framed the question as "whether a person can knowingly possess images of child pornography he or she views while browsing the Internet if there is no evidence that the images viewed were in the computer hard drive." 324 Wis. 2d at 518.

After reviewing caselaw from other jurisdictions, finding *Diodoro* to be the case with the most similar facts, the court said that its "impression of these cases is that courts are more concerned with how the defendants got to the website showing child pornography, than what the defendants actually did with the images." 324 Wis. 2d at 526. The court further stated:  "This fits within the definition of constructive possession:  the user could save, print or take some other action to control the images, and the user

22

affirmatively reached out for and obtained the images knowing that the images would be child pornography as shown by the pattern of web browsing." 324 Wis. 2d at 526. The court believed its holding was consistent with the purposes of statutes prohibiting child pornography, which include protecting juveniles and destroying the market for child pornography. 324 Wis. 2d at 527-28. The court was unconcerned with the fact that there were no files discovered in Mercer's cache or anywhere else on his hard drive, noting that "cache evidence is not required to prove possession because people can control an image they view from the Internet just as they can from the cache." 324 Wis. 2d at 530.

Finally, the State cites *State v. Linson*, 896 N.W.2d 656 (S.D. 2017). Police searched Todd Linson's computer and discovered that he had searched for child pornography, and that several websites in Linson's browser history contained child pornography. They seized Linson's computer and performed a forensic analysis on it. The analysis revealed 41 images of possible child pornography in Linson's temporary internet file cache and an additional 360 images of child pornography in the unallocated space on Linson's computer. Ultimately the State charged Linson with five counts of possessing child pornography—each count was associated with a file found in the cache. Linson was convicted on all five counts and appealed. 896 N.W.2d at 658-59.

The court began with the common premise "that the presence of cached images or files, standing alone, is not sufficient to establish that a defendant knowingly possessed those cached images or files." 896 N.W.2d at 659. Instead, the court held, "cached images or files are evidence of possession." 896 N.W.2d at 660. Linson argued "that using cached images as evidence of possession amounts to the punishment of viewing child pornography." 896 N.W.2d at 660. The court recognized that "[t]he federal government and other states have prohibited viewing child pornography, but it is not explicitly prohibited by South Dakota's statutes." 896 N.W.2d at 660. Nevertheless, the court still found that based on the evidence, the jury could find that Linson took affirmative actions

23

"to seek out child pornography and place it on his computer at one point in time and for whatever duration he chose, bringing it under his control." 896 N.W.2d at 663.

There are numerous other cases exploring this subject. E.g., *Marsh*, 389 P.3d at 102 (holding that "when a computer user seeks out and views child pornography on the internet, he possesses the images he views"); *New v. State*, 327 Ga. App. 87, 93-94, 755 S.E.2d 568 (2014) ("[A] computer user who intentionally accesses child pornography images on a website 'gains actual control over the images, just as a person who intentionally browses child pornography in a print magazine "knowingly possesses" those images, even if he later puts the magazine down.'"); *People v. Flick*, 487 Mich. 1, 4, 790 N.W.2d 295 (2010) (finding that a person knowingly possesses child sexually abusive material when the person purposefully seeks out depictions of such material and views them online).

We now must determine whether possession, as that term is defined in the sexual exploitation of a child statute, encompasses accessing and viewing child pornography on the internet, or whether the computer user must take some additional affirmative act of control like printing, downloading, or saving.

Some of the cases cited by Ballantyne are distinguishable. In the Oregon Supreme Court's decision in *Barger*, for example, Oregon's legislature had chosen to specifically criminalize viewing child pornography in exchange for value. Because the legislature had designated viewing as a crime in one context and not another, the court concluded that the legislature intended to criminalize different behavior. *Barger*, 349 Or. at 560-61. In *Kent*, the New York Court of Appeals found it notable that federal courts require that digital images be connected to something tangible. 19 N.Y.3d at 301. In Kansas, however, there is no such requirement. The defendant must only possess a "visual depiction" with no requirement that it be reduced to a tangible form. K.S.A. 2018 Supp. 21-5510(a)(2).

The focus in Kansas' sexual exploitation of a child statute is on any visual depictions of a child under 18 years of age, not the medium by which they are depicted. A person can control a visual depiction on a webpage in many of the same ways as a person can possess a photograph. A person can view it, copy it, sell it, or carry it around (especially if the image is on a portable electronic device like a laptop or mobile phone). In some ways, a person who possesses an image on a webpage has more options than a person who possesses a photograph because an image on a webpage will not deteriorate in the same way as a physical photograph. It can also be manipulated more easily—a person can quickly zoom in on the image, duplicate it, or send it to others, among other actions.

We believe that possession of child pornography found on computers may be analyzed under the familiar principles of constructive possession. For example, if we analyzed this child pornography case under the familiar principles of constructive possession of an illegal drug case, proof of actual possession in a nonexclusive possession case is not required. Instead, proof of constructive possession will suffice. For instance, in a nonexclusive possession case, ownership or occupancy of a home or a vehicle in which illegal drugs are found can be circumstantial evidence of possession. Indeed, to support a conviction of an accused based on constructive possession in a nonexclusive possession case, the State, for example, must point to evidence of ownership or control of the home or vehicle, plus acts, statements, or conduct of the accused or other facts or circumstances that tend to show that he or she was aware of the presence and character of the contraband and that he or she had "'joint . . . control over [the contraband] with knowledge of and intent to have such control.'" See *State v. Rosa*, 304 Kan. 429, 434-35, 371 P.3d 915 (2016).

For these reasons, we interpret the definition of possession, as that term is used in K.S.A. 2018 Supp. 21-5510(a)(2), to include knowingly accessing and viewing child pornography when a defendant has joint or exclusive control over a visual depiction with

knowledge of or intent to have such control or knowingly keeps the visual depiction in a place where the defendant has some measure of access and right of control over it on the internet. See K.S.A. 2018 Supp. 21-5202(i) (defining the term "knowingly"); K.S.A. 2018 Supp. 21-5111(v) (defining the term "possession").

*Did the State present sufficient evidence to show that Ballantyne possessed the charged images?*

To determine what possession means under K.S.A. 2018 Supp. 21-5510(a)(2), we must consider the statutory requirements under K.S.A. 2018 Supp. 21-5111(v) and K.S.A. 2018 Supp. 21-5510(d)(5). First, we must consider the State's contention that "there is no requisite mental state in [K.S.A. 2018 Supp. 21-5510(a)(2)] that the State is required to prove." Then the State later states that K.S.A. 2018 Supp. 21-5510(a)(2) "does not require the State prove a culpable mental state, therefore any of the three mental states—intentionally, knowingly, or recklessly—will suffice. K.S.A. 21-5202(e)." We disagree with the State's contention. The State, however, later acknowledged in its brief that K.S.A. 2018 Supp. 21-5510(a)(2) does require the State to prove that Ballantyne possessed the visual depiction. And the State further acknowledged, citing K.S.A. 2018 Supp. 21-5111(v) as its authority, that possession does require the person to knowingly have control over an item or to knowingly keep an item in a place where the person has some measure of access and right of control.

We agree that K.S.A. 2018 Supp. 21-5510(a)(2), the sexual exploitation of a child statute, does not mention a knowledge requirement on its face. The plain language of K.S.A. 2018 Supp. 21-5510(a)(2) contains two mental states: one on its face and the other enclosed within the definition of the word "possession," which applies to crimes involving sexual exploitation of a child. See K.S.A. 2018 Supp. 21-5111(v) (defining the term "possession"). To begin with, K.S.A. 2018 Supp. 21-5510(a)(2) requires possession to be committed "with intent to arouse or satisfy the sexual desires or appeal to the

26

prurient interest of the offender or any other person." See K.S.A. 2018 Supp. 21-5202(h) (defining the term "'with intent'").

Next, the statutory definition of the word "'possession'" under K.S.A. 2018 Supp. 21-5111(v) breaks the definition into two halves. By this definition, the conduct required for possession is explained. The first half of the definition defines possession as "having joint or exclusive control over an item with knowledge of or intent to have such control." The second half of the definition defines possession as "or knowingly keeping some item in a place where the person has some measure of access and right of control." The possessed item under K.S.A. 2018 Supp. 21-5510(a)(2) is the "visual depiction of a child under 18 years of age," which is defined as "any photograph, film, video picture, digital or computer-generated image or picture, whether made or produced by electronic, mechanical or other means," and this definition would include the 25 images and the video found on Ballantyne's computer. See K.S.A. 2018 Supp. 21-5510(d)(5).

Ballantyne argues that the State could not prove that he knowingly possessed the 26 files on the computer because the files could have gotten on his computer through some automatic function without him knowing about it. To determine what this word knowingly means under K.S.A. 2018 Supp. 21-5510(a)(2), we must consider the statutory definition under K.S.A. 2018 Supp. 21-5202(i): "A person acts 'knowingly,' or 'with knowledge,' with respect to the nature of such person's conduct or to circumstances surrounding such person's conduct when such person is aware of the nature of such person's conduct or that the circumstances exist." In this context, the term "nature" commonly means "[a] fundamental quality that distinguishes one thing from another; the essence of something." Black's Law Dictionary 1238 (11th ed. 2019). Thus, knowingly means that the evidence must show that the person was aware of the presence and character of the specific contraband possessed and that the person was consciously in possession of the specific contraband. See *State v. Rizal*, 310 Kan. 199, 207, 445 P.3d 734 (2019).

27

Ballantyne claimed that the police told him that a man had hacked into his computer and placed child pornography on his computer. The first half of the possession definition in K.S.A. 2018 Supp. 21-5111(v)—"having joint or exclusive control over an item with knowledge of or intent to have such control"—involves a possession that need not be exclusive because of the use of the word "joint" in the clause. The use of the words "joint or exclusive" would seem to enumerate a single class of words possessing alternative qualifications. Thus, the use of the word "joint" in the statutory definition would be an alternative qualification to the word "exclusive." The word "joint" in the legal context generally signifies shared or collective responsibility (being two or more persons) or shared property ownership. Also, Black's Law Dictionary defines the word "joint" as follows:  "(Of a thing) common to or shared by two or more persons or entities . . . . (Of a person or entity) combined, united, or sharing with another." Black's Law Dictionary 1002 (11th ed. 2019). So, the first half of the definition under K.S.A. 2018 Supp. 21-5111(v) would allow a visual depiction of child pornography to be possessed by more than one person simultaneously.

The State pursued a constructive possession theory for counts 1-25 by arguing that Ballantyne possessed the files when he viewed them on the internet. For example, the State claims that "[a] person had to turn on the computer, download, or browse these images from the internet for these images to have been later found in unallocated space." In response, Ballantyne argues that "[t]he act of navigating to a website, resulting in images on a browser page, is not enough to constitute the 'possession' of the images under the sexual exploitation statute." The second half of the possession definition in K.S.A. 2018 Supp. 21-5111(v)—"or knowingly keeping some item in a place where the person has some measure of access and right of control"—involves a possession that need not be either exclusive or actual. It is sufficient that the person knowingly keeps the contraband involved in a place where the person has some measure of access and that contraband is subject to that person's right of control. Under these circumstances, a person may constructively possess the contraband.

28

Thus, to convict a defendant of sexual exploitation of a child for possession of child pornography under K.S.A. 2018 Supp. 21-5510(a)(2), we hold that the State must prove that a defendant had knowledge of the nature of the visual depiction—meaning, that defendant either knew the essential character or the identity of the visual depiction and that defendant had joint or exclusive control over the visual depiction with knowledge of or intent to have such control or that the defendant knowingly kept the visual depiction in a place where the defendant had some measure of access and right of control. "Control" is not defined by statute, but Black's Law Dictionary defines it as "[t]o exercise power or influence over." Black's Law Dictionary 416 (11th ed. 2019); see also K.S.A. 2018 Supp. 21-5111(v) ("possession"); K.S.A. 2018 Supp. 21-5202(i) ("knowingly"). Simply put, the State must point to evidence of facts, statements, or conduct of the defendant or other facts or circumstances which tend to show that the defendant was knowingly aware of the presence and character or the identity of the visual depiction and that the depiction was consciously subject to his or her control and influence.

In its brief, the State maintained that the best way to consider Ballantyne's insufficiency of the evidence claims is by differentiating the factual dissimilarities encountered between the images of counts 1-25 and the video in count 26. The State emphasized that counts 1-25 should be determined separately from count 26 because counts 1-25 were completely different from count 26. In driving home this point, the State gave several examples why counts 1-25 were very different from count 26: (1) that the images underlying counts 1-25 were all in the unallocated space of the computer or were deleted files; (2) that none of the images in counts 1-25 were able to be recalled by the user anymore; and (3) that many of the files involving counts 1-25 were missing details—such as whether the computer user or the computer downloaded the images or whether Ballantyne or the computer deleted the files. Counts 1-25 and count 26 are utterly separated by these distinctions encountered in counts 1-25. Thus, these factual dissimilarities between counts 1-25 and count 26 cut against the legal sufficiency of the

29

State's proof that Ballantyne was knowingly aware of the essential character or the identity of the images underlying counts 1-25 and that those images were consciously subject to his control. Indeed, this was something that the State needed to prove beyond a reasonable doubt to obtain Ballantyne's conviction of counts 1-25 under the statutory definition of K.S.A. 2018 Supp. 21-5202(i) (defining the term "knowingly").

We now turn to the question of whether the State presented sufficient evidence to support Ballantyne's convictions. Because we agree with the State that the evidence for counts 1-25 and for count 26 is utterly separated by the contrast of the evidence encountered in them, we will discuss them separately.

*Counts 1-25*

There was no direct evidence that Ballantyne viewed the 25 files found in the unallocated space that formed the basis for his convictions. Thus, the State had to prove possession with circumstantial evidence. The fact-finder may make reasonable inferences based on the established circumstances of the case. But convictions based on "circumstantial evidence '"can present a special challenge to the appellate court" because "'the circumstances in question must themselves be proved and cannot be inferred or presumed from other circumstances.'"'" *State v. Banks*, 306 Kan. 854, 859, 397 P.3d 1195 (2017). "Where the State relies on such inference stacking, *i.e.*, where the State asks the jury to make a presumption based upon other presumptions, it has not carried its burden to present sufficient evidence." 306 Kan. at 859. Ballantyne argues that his convictions were based on impermissible inference stacking.

To begin, it is worth noting that the State's evidence was sufficient to establish that Ballantyne viewed child pornography on his computer. The presence of child pornography on his computer, his search history, and his admission that he viewed child pornography all provided a basis for the jury to reasonably infer that Ballantyne accessed

30

and viewed child pornography. But the State did not charge Ballantyne with generally viewing child pornography—the State charged Ballantyne with possession of 25 images or files in the unallocated space of his computer. Then we must pause to ask two questions: Did the State present sufficient evidence from which the jury could infer (1) that Ballantyne knowingly possessed the 25 images found in the unallocated space of his computer which tended to show that he knowingly accessed and viewed the images over which he had "joint or exclusive control over [the images] with knowledge of or intent to have such control" or (2) that he "knowingly [kept] some [images] in a place where [he] ha[d] some measure of access and right of control" over the images? See K.S.A. 2018 Supp. 21-5111(v) (defining the term "possession").

There was no question that the 25 files were found in the unallocated space on Ballantyne's computer and that Ballantyne possessed the computer. Nevertheless, Detective Randolph testified that the 25 images found in the unallocated space could not be recalled by Ballantyne without the assistance of specialized software which was not present on Ballantyne's computer. There was no evidence that Ballantyne tried to access the files, or even that he knew about the existence of the files in the unallocated space at all. Also, in contrast with the evidence for count 26, the State had very few details on the files forming the basis for counts 1-25. Detective Randolph could not determine whether Ballantyne intentionally downloaded the files or whether they arrived on Ballantyne's computer through some automatic function. Similarly, he could not say whether Ballantyne deleted the files or whether they were deleted automatically. He did not know when the files arrived on the computer or when they were deleted from the allocated space. Detective Randolph also could not determine whether Ballantyne viewed any of the files or whether they had ever been visible on his computer screen.

As stated earlier, the mere presence of child pornography in the unallocated space of a computer cannot be shown to be in the accused's possession because the material in the unallocated space cannot be accessed or seen without specialized software. See

31

*United States v. Flyer*, 633 F.3d 911, 918 (9th Cir. 2011); *United States v. Moreland*, 665 F.3d 137, 152 (5th Cir. 2011) (an accused cannot be convicted of possessing child pornography solely on evidence of the presence of photographs in the unallocated space). There must be some additional evidence to prove knowing possession of files in the unallocated space. The State failed to present that additional evidence here. Indeed, because the State could not show that Ballantyne knowingly accessed and viewed the 25 images found in the unallocated space of his computer, it failed to show that he either had joint or exclusive control over the 25 images in the unallocated space of his computer with knowledge of or intent to have such control. Thus, measured by the first half of the statutory definition for possession under K.S.A. 2018 Supp. 21-5111(v), the State's evidence would have been insufficient to support Ballantyne's convictions for counts 1-25 under the theory that he knowingly accessed and viewed the images which he had "joint or exclusive control over [counts 1-25] with knowledge of or intent to have such control."

The next question we must address is whether the State proved that Ballantyne knowingly viewed and kept some images in a place where he had some measure of access and right of control over the images. The State points to evidence that Ballantyne repeatedly searched for child pornography, visited websites associated with child pornography, and that he viewed child pornography as a basis for the jury to reasonably infer that he viewed the files at issue. While this evidence all shows that Ballantyne had a general propensity for accessing and viewing child pornography, none of the evidence provided a basis for concluding that he knowingly viewed and kept any of the specific 25 images charged in a place where he had some measure of access and right of control over the images. As Ballantyne argues, "[S]eeking out child pornography on the internet does not establish the knowing possession of the specific images charged by the State. And, Mr. Ballantyne never said he viewed the specific images charged."

32

Also, Ballantyne points out in his reply brief, he is unlike the defendants described in the State's brief because those defendants viewed or retrieved the images they were charged with. In *Josephitis*, the defendant admitted that he viewed the specific images at issue. 394 Ill. App. 3d at 296. In *Diodoro*, the defendant also stipulated that he viewed the specific images at issue. 601 Pa. at 8; see also *Mercer*, 324 Wis. 2d at 518, 527 (Mercer affirmatively pulled up and viewed the images of child pornography); *Linson*, 896 N.W.2d at 662-63 (Linson affirmatively acted to place the images on the computer). On the other hand, Ballantyne never admitted to viewing the specific images for which he has been charged. Because the State failed to present sufficient evidence that Ballantyne knowingly viewed and kept any of the images charged in counts 1-25, his convictions cannot be upheld under the constructive possession language of the second half of K.S.A. 2018 Supp. 21-5111(v) ("or knowingly keeping some item in a place where the person has some measure of access and right of control").

In summary, the record shows that the only evidence that specifically tied Ballantyne to the images charged in counts 1-25 was the discovery of the files in the unallocated space on his hard drive. The State, however, was unable to prove whether the images ended up in the unallocated space because Ballantyne deleted them or because some function of the computer such as the automatic deletion function of the temporary internet file cache. There was also no conclusive evidence as to how the files got on the computer in the first place. Ballantyne could have downloaded them, or the computer could have downloaded them without Ballantyne ever seeing them. As discussed in *Kuchinski*, 469 F.3d at 861, among many other cases, this evidence is insufficient on its own to establish knowing possession of the files in the unallocated space because it is not possible to conclude beyond a reasonable doubt if the images were knowingly accessed and viewed by Ballantyne.

So, we reverse the 25 convictions for sexual exploitation of a child related to the 25 images found in the unallocated space of Ballantyne's computer. Because we reverse

33

these convictions, it is not necessary for us to address Ballantyne's alternative argument that the State failed to prove that he committed the crimes within the time frame charged in the complaint.

*Count 26*

As we have reversed those 25 convictions for sexual exploitation of a child, we next must consider Ballantyne's sufficiency of the evidence challenge as to his possession of child pornography regarding count 26—a video found in the recycle bin of his computer.

Ballantyne advances several theories of innocence, including that Detective Randolph did not testify that the computer user downloaded and saved image 26. Also, Ballantyne argues that image 26 was an MP4 file, which the computer could have downloaded into the cache. He also argues that there was no proof that he viewed this image or knew what the file was or how long the file was accessed, or whether the user watched the entire video, did not watch it, or took some other action. As we mentioned previously, we believe that possession of child pornography found on computers may be analyzed under the familiar principles of constructive possession. So, we will employ again these principles of constructive possession.

Along with the above arguments, Ballantyne claimed that when the police went to his residence, they told him that a woman knew a man who was a computer hacker, and the woman thought the man had hacked into Ballantyne's internet and sent child pornography to him. Ballantyne's claim indicated an innocent explanation as to why child pornography would be found on his computer. Nevertheless, at trial, Detective Carswell said that the officers did not tell Ballantyne anything of that nature. In retrospect, Ballantyne's claim showed that he was aware that his computer contained images of child pornography.

34

Further, the evidence shows that the 26th file found in Ballantyne's recycle bin was created on December 11, 2018, at 1:59 p.m. Also, the video file was originally located in the downloads folder. But it was moved to the recycle bin that same day at 2:07 p.m. The evidence shows that the file was accessed one time before being moved to the recycle bin.

Because Ballantyne's computer had pornographic images found in the unallocated space of his computer, because his internet browsing history showed that he had visited websites associated with child pornography, and because he admitted to police that he occasionally viewed some videos and pictures of young children out of curiosity when those videos and pictures would pop up while he was browsing adult pornography websites, this established a greater likelihood that Ballantyne, not a virus or a hacker, website, or other family member, put the pornographic video on his computer found in the recycle bin. Indeed, Detective Randolph did not find any viruses or malware on Ballantyne's computer that would indicate that someone else put the child pornography files on his computer. Although the State could not prove Ballantyne knowingly possessed the 25 images found in the unallocated spaces of his computer, their presence nevertheless was a circumstance probative of his possession of the video file.

Here, the record shows that expert testimony established that computer users can access and control files placed by the user into the recycle bin. So, the deleted video file in Ballantyne's recycle bin was accessible to him, and he could readily restore the video file for his use. Under these facts, Ballantyne constructively possessed the video in the recycle bin of his computer. And measured by the statutory definition for possession under K.S.A. 2018 Supp. 21-5111(v), the State's evidence was sufficient to meet the second prong of this statutory definition—"or knowingly keeping some item in a place where the person has some measure of access and right of control."

Another reason—during a police interview with Ballantyne—he stated that he had been using the laptop for the past four years and that no one else in the house used his laptop. This evidence would be evidence of exclusive control because it showed that Ballantyne had exclusive use of the laptop for four years before his arrest. So, this evidence considered in its entirety, supported a finding that Ballantyne was knowingly aware of the presence of and the nature of the video in the recycle bin. Furthermore, the evidence showed that Ballantyne knowingly exercised exclusive control and influence over the video because it did not require any specialized software necessary to access and retrieve the video. We therefore conclude that Ballantyne was knowingly aware of the presence and of the nature of the illicit video in the recycle bin of his computer and that he exercised exclusive control over the video with knowledge of or intent to have such control. See K.S.A. 2018 Supp. 21-5111(v) ("having joint or exclusive control over an item with knowledge of or intent to have such control").

As we stated earlier, our standard of appellate review is well-established. The appellate court examines all the evidence in a light most favorable to the prevailing party—the State—to determine whether a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. Because an appellate court does not reweigh evidence, resolve evidentiary conflicts, or make credibility determinations, a reviewing court need only look at the evidence in favor of the verdict to determine whether the essential elements of a charge are sustained. *State v. Zeiner*, 316 Kan. 346, 350, 515 P.3d 736 (2022). Viewed in the light most favorable to the State, a rational fact-finder could find beyond a reasonable doubt that Ballantyne knowingly possessed the illicit video.

Thus, we affirm Ballantyne's conviction under count 26 for sexual exploitation of a child related to the possession of the illicit video found in the recycle bin of his computer.

*Did prosecutorial error prejudice Ballantyne's right to a fair trial?*

Because we find that the State presented sufficient evidence to support his conviction for count 26, we must now address Ballantyne's other points of error. First is Ballantyne's argument that the prosecutor misstated the facts in closing argument and that the error prejudiced his right to a fair trial. The appellate court uses a two-step process to evaluate claims of prosecutorial error:

> "To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.' [Citation omitted.]" *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

*Error*

Ballantyne identifies three instances in which he argues that the prosecutor misstated the facts during closing argument. Prosecutorial error occurs when a prosecutor states facts that are not in evidence. *Banks*, 306 Kan. at 862. "In determining whether a particular statement falls outside of the wide latitude given to prosecutors, the court considers the context in which the statement was made, rather than analyzing the statement in isolation. [Citation omitted.]" *State v. Ross*, 310 Kan. 216, 221, 445 P.3d 726 (2019). So, we will review the relevant portions of the closing arguments.

In the initial part of his closing argument, the prosecutor accurately recited the evidence on counts 1-25 insofar as he said that the files were found in the unallocated space of the hard drive, and because of that "no one could say when they were put there, or how they were put there, etc." Regarding count 26, the prosecutor said that it "was downloaded" (not specifying whether Ballantyne or the computer downloaded it) and "existed . . . in the main part of the computer, for lack of a better term, for seven minutes" after which "it was sent to the recycle bin."

In response, defense counsel acknowledged that the images were found on Ballantyne's computer but argued that they could have arrived there inadvertently by being downloaded without Ballantyne's knowledge that they appeared on a website, or by showing up uninvited in an advertisement or pop-up. Defense counsel stressed that there was no direct evidence that Ballantyne watched the video in the recycle bin or viewed the images charged in counts 1-25. Defense counsel also argued that viewing something does not amount to possession.

During his rebuttal argument, the prosecutor made the three statements at issue. The prosecutor first suggested that Ballantyne downloaded zip files containing child pornography, stating:

> "We know that this defendant, in the four months leading up to this, regularly searched on child pornography sites. We know that he regularly downloaded; he told the cops he didn't download. Some of you know what zip files are. Those are compressed files that are put all in one batch. He downloaded multiple child pornography zips. You heard the detective—I'm trying not to put words in the detective's mouth. You heard the detective when he explained the Windows Timeline Activity to you. First of all, you see the site he went to, then you, it says Apps, App in Use, and then following it says, Open App, and you've got a time that the app was open. He downloaded zip files. Zip files, ladies and gentlemen, on a regular basis. You can't get into a zip file unless you download it.

38

"Some of the names on the zip files are, Page 257, Alicia, 5-year-old Anal Fuck. That's a zip file. He downloaded and then br[oke] the zip file apart. Page 258, Pretty Celia, 5-year-old Extreme. Zip file. Same page, 9-year-old Dildo Play. Another zip file, downloaded and opened. Page 254, Pretty Less Forced Sex, 7-year-old. Another zip file.

". . . [Ballantyne] went to the seedy websites, on the Internet, and he downloaded porn, ladies and gentlemen."

The evidence in this case does not support the prosecutor's statement. There was no evidence that Ballantyne actively downloaded anything—much less multiple zip files containing batches of child pornography. The State concedes that the prosecutor erred in referencing zip files but argues that the error was a simple mistake in terminology that did not prejudice Ballantyne's right to a fair trial. We will address the prejudice issue in the prejudice section of our analysis.

Ballantyne also argues that the prosecutor misstated the facts in discussing the 26th charge, the file in the recycle bin. Regarding the 26th file, the prosecutor said, "[I]t was there for seven minutes before it was sent to the recycle bin. . . . Seven minutes he had it on the computer. Now, during that seven minutes he was in possession."

Here, Ballantyne characterizes the prosecutor's statement as ignoring that the file may have been downloaded by the computer and that Ballantyne may have deleted the file without viewing it. Nevertheless, the prosecutor's statement was consistent with Detective Randolph's testimony about the file. The prosecutor was merely drawing an inference—that Ballantyne possessed the file—from the facts presented. A prosecutor has "wide latitude to draw reasonable inferences from the evidence in closing arguments. A prosecutor does not err when adequately buttressing their inferential arguments with the factual premises necessary to support their inferences, even in the absence of language such as 'it is a reasonable inference that . . . .'" *State v. Blevins*, 313 Kan. 413, Syl. ¶ 3, 485 P.3d 1175 (2021). For this reason, we find that the prosecutor's second statement was not error.

The third and final statement that Ballantyne challenges relates to counts 1-25. He takes issue with a series of statements by the prosecutor related to the State's argument that viewing amounts to possession of child pornography. The prosecutor began by saying that "[t]he still photographs, when they appeared on his screen, he was in possession of those. He got to choose what he did." Next, the prosecutor suggested that "when an image is on your computer screen, you may not own that image . . . . But you're in possession of the image that's on your screen." Finally, the prosecutor said, "When Mr. Ballantyne downloaded these images, he was in control of those images."

Ballantyne contends that the prosecutor erred "by arguing facts or factual inferences with no evidentiary foundation." Nevertheless, the prosecutor's statements were more legal than factual in nature. The prosecutor was asking the jury to draw the legal conclusion that Ballantyne possessed the images in question. This particular statement did not misstate the facts but rather, as with the previous statement, it asked the jury to draw an inference from those facts. Accordingly, we do not find that this statement is erroneous.

*Prejudice*

Having found that the prosecutor misstated the facts by stating that Ballantyne downloaded zip files containing child pornography, we will next determine whether the error prejudiced Ballantyne's right to a fair trial.

The prosecutor's statement about the zip files was clearly problematic as it bore on the issue of whether Ballantyne knowingly possessed the files found on his computer. The statement was also made during the prosecutor's rebuttal argument—the last argument the jury heard before beginning its deliberations. Nevertheless, the prejudicial effect of the statement was mitigated by other factors, and because of this, there is no reasonable possibility that the prosecutor's error contributed to the jury's verdict.

First, the prosecutor accurately stated the evidence in the first portion of his closing argument because he acknowledged that the State could not prove whether the files found on Ballantyne's hard drive were intentionally downloaded by Ballantyne or downloaded by some automatic function of his computer. The prosecutor also repeated this evidence in his rebuttal argument after his initial reference to Ballantyne downloading the zip files, stating:

> "There wasn't many things [Detective Randolph] could say about those first 25 things because the file information was deleted. But he did say there were three things we can say: There had to be a human that operated that computer. That human had to go to a child porn website, and then they would, the display would have either displayed on the screen or he would have downloaded it, one or the other. Those zip files I told you about, they got downloaded. Because that's what zip files do."

Of course, the prosecutor's reference to zip files in the statement quoted above is inaccurate because there was no evidence that the files were zip files, but the statement acknowledged that the images could have been downloaded automatically by the computer and not intentionally by Ballantyne himself, as suggested by the prosecutor's misstatement that Ballantyne downloaded multiple child pornography zip files. The fact that the prosecutor's misstatement of the facts was isolated and clarified by the prosecutor's other statements reduces the chance that the misstatement of fact improperly influenced the jury.

Second, the evidence presented to the jury made no mention of Ballantyne downloading zip files. There was ample testimony dedicated to allocated space, unallocated space, cache files, and other matters, but none that referenced zip files. The testimony was also very clear that the forensic examiner could not directly establish that Ballantyne himself downloaded the files onto his computer, because there was always the possibility that the files were downloaded by some automatic function of the computer. Given the complete lack of testimony regarding the prosecutor's misstatement, the jury

41

could likely deduce that the prosecutor's statement was an error. Plus, the prosecutor, along with the jury instructions, warned the jury that the prosecutor's statements were arguments and not evidence. "[J]urors generally are presumed to follow their instructions." *State v. Slusser*, 317 Kan. 174, 193, 527 P.3d 565 (2023).

Third, Ballantyne's counsel did not object to the prosecutor's misstatement of the facts. We "may . . . figure the presence or absence of an objection into our analysis of the alleged error." *State v. Bodine*, 313 Kan. 378, 406, 486 P.3d 551 (2021). If the prosecutor's statements had been objected to, the prosecutor could have rephrased his misstatements and made the same point—by maintaining that Ballantyne intentionally sought out and viewed child pornography, files containing images, and videos of child pornography, which were downloaded to his computer.

Overall, the State's argument that the prosecutor's error did not affect the outcome of the trial in light of the entire record is more impactful than Ballantyne's claim of prosecutorial error. For these reasons, we determine that the prosecutorial error argument falls short of the mark and reversal is not warranted by the law.

*Did the district court err by failing to instruct the jury on the culpable mental state elements of intentionally and knowingly?*

Ballantyne argues that the district court erred by failing to instruct the jury on the definitions of the words "intentionally" and "knowingly"—the culpable mental states the State had to establish to convict him of sexual exploitation of a child.

When analyzing jury instruction issues, appellate courts follow a three-step process: (1) determining whether the appellate court can or should review the issue, in other words, whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal; (2) considering the merits of the claim to determine whether error

42

occurred below; and (3) assessing whether the error requires reversal, in other words, whether the error can be deemed harmless. *State v. Holley*, 313 Kan. 249, 253, 485 P.3d 614 (2021). Whether a party has preserved a jury instruction issue affects the appellate court's reversibility inquiry at the third step. 313 Kan. at 254. When a party fails to object to a jury instruction before the district court, an appellate court reviews the instruction to determine if it was clearly erroneous. K.S.A. 2022 Supp. 22-3414(3).

Ballantyne did not object to the jury instructions provided to the district court. So, we apply a clear error review if we find error in the second step of the analysis. "To reverse for clear error, the court must be firmly convinced the jury would have reached a different verdict had the instruction error not occurred. [Citation omitted.]" *State v. Brammer*, 301 Kan. 333, 341, 343 P.3d 75 (2015). The burden of showing clear error is on the defendant. *State v. Martinez*, 317 Kan. 151, 162, 527 P.3d 531 (2023).

Ballantyne asserts that the district court should have instructed the jury on the definitions of "knowingly" and "intentionally" as provided in PIK Crim. 4th 52.010 (2021 Supp.). The PIK instruction is consistent with the statutory definitions of the terms in K.S.A. 2018 Supp. 21-5202. Thus, the instruction would have been legally appropriate. The instruction also would have been factually appropriate because the State had to prove a knowing act and a specific intent. See K.S.A. 2018 Supp. 21-5510(a)(2) (prohibiting possessing child pornography "with intent to arouse or satisfy the sexual desires or appeal to the prurient interest of the offender or any other person"); K.S.A. 2018 Supp. 21-5111(v) (stating that possession is a knowing act).

Even though the mental state instruction would have been both legally and factually appropriate, we have consistently refused to find error when a district court fails to define the terms "intentionally" or "knowingly" in jury instructions. See *State v. Collins*, No. 121,112, 2021 WL 936048, at *6 (Kan. App. 2021) (unpublished opinion) (listing cases that have rejected this argument). This is because "[a] term which is widely

used and which is readily comprehensible need not have a defining instruction." *State v. Norris*, 226 Kan. 90, Syl. ¶ 4, 595 P.2d 1110 (1979). A court need only define a word if its common lay definition differs from the legal definition. *Collins*, 2021 WL 936048, at *6. "Knowingly" and "intentionally" do not fall into this category. They are "'widely used words'" and "'readily comprehensible by individuals of common intelligence.'" 2021 WL 936048, at *6. "[I]t is a longstanding rule of this court that trial courts only have a duty to define words within an instruction '"when the instructions as a whole would mislead the jury, or cause them to speculate, that additional terms should be defined."' *State v. Armstrong*, 299 Kan. 405, 440, 324 P.3d 1052 (2014) (quoting *State v. Norris*, 226 Kan. 90, 95, 595 P.2d 1110 [1979])." *State v. Bacon*, No. 114,951, 2017 WL 2403355, at *10 (Kan. App. 2017) (unpublished opinion). Thus, we conclude that the district court did not err, much less commit clear error, and Ballantyne's argument is not warranted by the law.

*Did cumulative errors deprive Ballantyne of his right to a fair trial?*

Finally, Ballantyne argues that the cumulative effect of trial errors, namely the prosecutor's impermissible argument and the district court's failure to instruct the jury on the definitions of "intentionally" and "knowingly," warrants a new trial. Nevertheless, as discussed in the previous section, the district court did not err in giving the jury instructions. Thus, there is only one error. The cumulative error rule does not apply if there are no errors or only a single error. *State v. Gallegos*, 313 Kan. 262, 277, 485 P.3d 622 (2021).

Affirmed in part and reversed in part.